**MILWAUKEE POSTAL BLDG. CORPORA-
TION v. McCANN et al. (two cases).**
**Nos. 10943, 10966.**

Circuit Court of Appeals, Eighth Circuit.
April 9, 1938.

missed the petition. These appeals are from the orders sustaining the motion to dismiss and dismissing the petition. Appeal No. 10,943 was allowed by this court and appeal No. 10,966 by the District Court.

The sole question here, as stated by counsel, is whether the petition of appellant was filed "in good faith" within the meaning of section 77B (a), 11 U.S.C.A. § 207(a). The question is better stated as whether the petition was properly dismissed upon any ground.

The court made extended findings of fact and stated conclusions of law. Among both the findings and the conclusions is the statement that the appellant was organized for the purpose of taking advantage of section 77B. While this is not the sole ground stated by the court for the dismissal, it is sufficient if sustained.

Prior to the enactment of section 77B, there were two courses open, in the federal court, for debtors in difficulties and for the creditors of such. One was bankruptcy, the other an equity receivership.

The sole purposes of bankruptcy were liquidation of the debtor by realizing on his or its property (dividing the proceeds among his participating creditors) and release of the bankrupt from such indebtedness. This was worked out by a voluntary or involuntary turning over of such property for realization and distribution. The only apparent exception in the Bankruptcy Act to such effects and procedure was recognition and enforcement of the right of composition. This right was that the bankrupt might "bargain" with his creditors for his release. If such bargain was freely and fairly entered into by a majority of the creditors and found to be fair to all creditors by the court, it would be enforced. The usual effect of a composition was to leave the bankrupt his property upon payment into court of an agreed sum or upon his promises to pay as agreed. This was purely a matter of contract between the parties under the conditions set forth in the act. Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 585, 55 S.Ct. 854, 861, 79 L.Ed. 1593, 97 A.L.R. 1106; Myers v. International Trust Co., 273 U.S. 380, 383, 47 S.Ct. 372, 374, 71 L.Ed. 692; Cumberland Glass Mfg. Co. v. De Witt & Co., 237 U.S. 447, 452–454, 35 S.Ct. 636, 59 L.Ed. 1042. Thus bankruptcy offered little opportunity for rehabilitation of the bankrupt and no opportunity for permanent preservation of the business for and by the creditors.

Meyer Hessel, of St. Louis, Mo. (William Healy, of St. Louis, Mo., on the brief), for appellant.

John C. Love, of Milwaukee, Wis. (W. L. Gold and Ray T. McCann, both of Milwaukee, Wis., on the brief), for appellees.

Before STONE, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

STONE, Circuit Judge.

On February 23, 1937, appellant filed its petition under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, and upon the following day, without hearing, the petition was approved. Later, appellees filed an answer and motion to dismiss the above petition. After full hearing upon the issues thus raised, the court made findings of fact, stated conclusions of law, and dis-

An equity receivership may or may not work out rehabilitation of the debtor; may or may not result in preservation of the business for the creditors and, possibly, for the debtor also; and may or may not result in complete liquidation of the debtor. While these possibilities existed in an equity receivership, there were practical and legal difficulties in preserving the business either for the debtor, for the creditors, or for the creditors and debtor. The only way in which the business could be preserved for the debtor was for the debts and the costs of the receivership to be paid—this was not usually accomplished. Ordinarily, the only way the business could be preserved for the creditors or for the creditors and debtor was through a reorganization which would include the creditors, or the creditors and the debtor. Such reorganization inevitably meant a loss to some or all of the parties affected thereby. The practical difficulty lay in securing complete agreement of all creditors and the debtor to a plan which thus involved loss. There was danger sometimes from the impositions of a tyrannical majority and sometimes from the insistence of a pestiferous minority. The legal difficulties were the lack of power in the court to control the parties and the necessity of a sale of the property and satisfaction in full of recalcitrant minorities at the expense of others interested in the property of the debtor. Also, there were practical considerations of expense, etc., in an equity receivership.

As a practical matter, it was often highly advisable that reorganization should take place in order to conserve the full value of the property. Yet there was no existing legal method of fairly working this out. It was to remedy this situation that section 77B was enacted. See Duparquet Huot & Moneuse Co. v. Evans, 297 U.S. 216, 218, 56 S.Ct. 412, 413, 80 L.Ed. 591. That section is not a liquidation remedy in the sense that liquidation shall be made in the proceeding[1]. In re Island Park Associates, 2 Cir., 77 F.2d 334, 337; In re Greyling Realty Corporation, 2 Cir., 74 F.2d 734, 736, certiorari denied Troutman v. Compton, 294 U.S. 725, 55 S.Ct. 639, 79 L.Ed. 1256. In fact, if there is to be such liquidation, the proceeding ceases to be within the remedy created by the section and passes under the pre-existing provisions of the Bankruptcy Act, section 77B (c) (8) and (k), 11 U.S.C.A. § 207(c) (8), (k). The section is designed to meet the situation of a reorganization and preservation of the business by the creditors and, possibly also, the debtor.

It is confined to instances where the debtor is a corporation. It has nothing to do with the situation where the debtor is an individual or a partnership—sections 74 and 75, as amended, U.S.C.A. title 11, §§ 202 and 203, cover the field as to individuals in so far as Congress deemed it wise so to do. It deals solely with corporate reorganizations. This being true, it is clear that it would be not only a legal fraud upon creditors, but without the intendment of this section to construe as within the section a corporation formed to and taking over the property of an individual debtor for the purpose of utilizing the section. Shapiro v. Wilgus, 287 U.S. 348, 53 S.Ct. 142, 77 L.Ed. 355, 85 A.L.R. 128; Platt v. Schmitt, 8 Cir., 87 F.2d 437, 440; In re Collins, 8 Cir., 75 F.2d 62; In re North Kenmore Building Corp., 7 Cir., 81 F.2d 656, and see In re Philadelphia Rapid Transit Co., D.C.Pa., 8 F.Supp. 51, approved in Wilson v. Philadelphia Rapid Transit Co., 3 Cir., 73 F.2d 1022, contra, In re Loeb Apartments, 7 Cir., 89 F.2d 461. In the Platt Case, supra, Judge Woodrough, for this court, said: "There is a duty in the courts to see that provisions of the act are not abused and that its privileges are extended only to those who are within the contemplation of the act." 87 F.2d 437, at page 440.

The question here is whether this debtor, Milwaukee Postal Building Corporation, was organized for the purpose of taking over this property and availing itself of section 77B. The fact picture drawn from the findings of fact and the evidence is as follows: National Postal Buildings, Inc., owned a large one story garage building in Milwaukee which was leased to the Post Office Department until April 15, 1938. In 1928, it issued bonds secured by a deed of trust upon this property. Subsequently, it transferred the property to one Little. Early in 1936, there were $149,500 of these bonds outstanding. At that time, the interest, some taxes, and in respect to a sink-

---

[1] The distinction is that liquidation is not contemplated in the proceeding itself except upon failure of reorganization plans. It is immaterial that the plan of reorganization has as its real purpose liquidation by the reorganized corporation. In re Central Funding Corporation, 2 Cir., 75 F.2d 256.

ing fund provided for in the deed of trust, there were defaults. To remedy this condition, some of the bondholders formed a "Bondholders Reorganization Committee" on March 17, 1936. Later, this committee drew up a plan of reorganization which was sent to all other bondholders seeking approval thereof and deposit of bonds with the committee in order to put the plan in force. The plan set forth that a Missouri corporation had been formed, named "Milwaukee Postal Building Corporation" with 299 nonpar shares and that, "upon confirmation of this plan" the shares would be issued in the joint names of three named persons as voting trustees until December 1, 1943. Voting trust certificates were to be issued bondholders—one share for every $500 bond. Within thirty days after December 1, 1943, the corporate stock was to be exchanged for the certificates. The due date of the bonds was to be extended to December 1, 1943, with lowered interest rate. There were provisions covering sale of the property and distribution of proceeds and covering sinking fund. The plan was to be effective upon acceptance by holders of 95 per cent. of the outstanding face value of bonds secured within eight months. The date of this plan does not appear, but, from a recital in the "Escrow Agreement," it seems shortly prior to June 30, 1936.

As necessary to the carrying out of this plan, Little, the committee, and the Mississippi Valley Trust Company entered into an "Escrow Agreement" on June 30, 1936. This agreement recited ownership of the property by Little, the amount of outstanding bonds and defaults, the formation of a plan of reorganization by the committee, the desire of the committee to secure ownership of the property and rents for benefit of the bondholders and to have a successor trustee appointed under the deed of trust, and that the "Milwaukee Postal Building Corporation will be formed" with an authorized capital stock of 299 nonpar shares to be subscribed equally by the two members of the committee and one share by the attorney for the committee. Following these recitals was the agreement as follows:

(1) Upon completion of incorporation of "Milwaukee Postal Building Corporation," the stock certificates issued to the subscribers are to be indorsed in blank and delivered to the trust company; (2) on the execution of this escrow agreement, Little will deposit with the trust company certificate of transfer of title certifying that title has passed to the Milwaukee Postal Building Corporation, quitclaim deed thereto and a check for $5,583.33 (being the collected rental for March-June, 1936); (3) the quitclaim deed is to be recorded, the certificate of transfer extended to show such record and the certificate to be sent the Post Office Department; (4) the check to be cashed and therefrom expenses incurred in organizing the corporation and in qualifying it to do business in Wisconsin—the balance with subsequent rents and the above certificates of stock to be held "pending the completion of a Plan of Reorganization, which Plan provides in substance that said Plan shall be declared effective when it is accepted by the holders of ninety-five per cent (95%) of the outstanding Bonds secured by a Trust Indenture on the herein described property, which Bonds are executed by National Postal Buildings, Inc. (Milwaukee Garage) and are in the amount of $149,500.00"; (5) if the plan of reorganization becomes effective, the stock certificates are to be delivered to the attorney of the committee for distribution to the Voting Trustees under the plan and the above funds to the successor trustee under the deed of trust; (6) if the plan be not accepted "by the holders of 95% of the outstanding bonds of this issue on or before the expiration of eight (8) months from the date hereof," the stock certificates are to be delivered to Little and the funds paid to the committee which shall use them first to pay committee expenses and the balance to the "successor trustee" under the deed of trust to be by him applied to payment of delinquent taxes, delinquent interest, and to "service of these bonds, as provided for in the" deed of trust.

The record shows delivery of the check but not the date of check or delivery. The quitclaim deed is dated June 30, 1936, and acknowledged July 3, 1936. Certificate of incorporation was issued the Milwaukee Postal Building Corporation on July 9, 1936, and a certificate to commence business on July 22, 1936. The trust company collected the rents and made certain expenditures so that it had, at the time of hearing below, $14,624.07.

February 13, 1937, a bondholder filed a foreclosure action in a state court at Milwaukee wherein he sought, also, a receiver and the appointment of a successor trustee under the deed of trust. February 18, 1937, two of the three directors of the debtor adopted a resolution authorizing filing this debtor petition. February 20, 1937, Little

executed a written instrument wherein, after reciting the provision in the escrow agreement as to his right to the stock certificates on failure of the plan, the filing of the foreclosure suit and the opinion of the above directors that a debtor petition should be filed, he "agrees that said Corporation shall file a petition under said section 77B of the National Bankruptcy Act in the United States District, as aforesaid, and, in consideration of the filing of said petition in said Court by said Corporation, agrees to and does hereby fully and completely waive his right to receive said shares of capital stock of said Corporation under the terms of said Escrow Agreement, and fully and completely releases and waives any and all right, interest or claim, of any and every nature, that he may have now or in the future to said shares of capital stock." February 23, 1937, this debtor petition was filed.

The above recital and other evidence show a sincere effort by a large majority of the bondholders[2] to work out a very difficult situation[3] by a plan out of court. The then owner had, apparently, no concern about any equity in the property. His concern seems to have been only in keeping the title and getting the rents for himself until he was pressed as to his duties to the bondholders when his concern seems to have changed to making his peace. The benefit which he hoped for from this out of court reorganization was by disgorging the rent for the last four months, to free himself from claims for diversion of the earlier rent during almost four years.

■ From the above it appears that the debtor was not organized nor was the property transferred to it for the specific purpose of taking advantage of section 77B. However, it was organized and the property conveyed to it for the sole purpose of attempting to work out a reorganization. The natural and inevitable result thereof would be a reorganization under the section if the out of court reorganization failed. This situation is within the spirit of the above decisions. Another consideration is that to construe the section otherwise would open the door to easy evasion—either intentional or unintentional. A corporation organized for such a purpose is not within the remedy afforded by the section.

■ Appellant has taken two appeals to obtain reversal of the order disallowing its claim for preference—one granted by the District Court and one by this court—and so has clearly established the jurisdiction of this court. In this situation, we deem it unnecessary to determine which appeal is the proper procedure and direct the clerk to file the opinion in both appeals and to enter, in each, an order of affirmance.

[2] The evidence shows bonds deposited to be $115,500 or more than 75 per cent. of those outstanding.

[3] The evidence shows that the deed of trust provided for setting aside of certain sums for a sinking fund for bond retirement. For about four years, the owner had collected and kept the entire rental and the trustees under the indenture had taken no action. Taxes were not paid. Interest was not paid. The property became out of repair to the point where the sole tenant was threatening to vacate. The legal and the financial responsibility of the owner (Little) was thought to be doubtful. He was continuing to collect and appropriate the entire rental in utter disregard of protection of the bondholders or of their security.